**EXHIBIT B**

| | |
|---|---|
| STATE OF MAINE | SUPERIOR COURT |
| PENOBSCOT, ss. | CIVIL ACTION |
| | Docket No. CV-20-_____ |

| | | |
|---|---|---|
| RICHARD ROE, DO, | ) | |
| | ) | COMPLAINT |
| Plaintiff | ) | |
| | ) | FOR DECLARATORY JUDGMENT |
| v. | ) | (14 M.R.S. §§ 5951-5963) |
| | ) | |
| MARIANNE LYNCH, DISTRICT | ) | AND |
| ATTORNEY FOR PROSECUTORIAL | ) | |
| DISTRICT V | ) | *MANDAMUS* RELIEF |
| | ) | (14 M.R.S. § 5301) |
| Defendant | ) | |

NOW COMES Richard ROE ("ROE"), by and through his undersigned counsel, and

states the following regarding his Complaint for Declaratory Judgment ("Complaint") seeking a

judicial declaration per 14 M.R.S. §§ 5951-5963 that *before* a prosecutor makes determinations

pursuant to *Giglio v. United States*, 405 U.S. 150, 154 (1972) and related cases (hereinafter

collectively "*Giglio*") that may lead to the officer's job loss and/or a revocation of the

occupational certification issued to the officer by the Board of Trustees of the Maine Criminal

Justice Academy ("MCJA") a Maine law enforcement or corrections officer ("officer") has a

constitutional right to meaningful notice of the *Giglio* allegations and a meaningful opportunity

to respond to those allegations.

ROE also seeks *mandamus* relief that would require Marianne Lynch, the District

Attorney for Prosecutorial District V, to: (a) rescind the *Giglio* determinations affecting ROE

that are specified herein because they were made in violation of ROE's constitutional rights to

due process; (b) provide ROE with meaningful notice of the allegations underlying the *Giglio*

complaints specified below; (c) provide ROE with a meaningful opportunity to respond to the

allegations contained in those *Giglio* complaints; and, (d) to otherwise provide ROE with

procedural and substantive due process when disposing of those *Giglio* complaints.

## INTRODUCTION

### Issue of First Impression

1.      This Complaint presents an issue of "first impression" to the Court, meaning that it appears that no Maine court (or a court of any other jurisdiction) has apparently resolved the question of whether a prosecutor whose *Giglio* determinations lead directly to an officer's job loss and/or to a corresponding revocation of the officer's certification to engage in his/her occupation has a constitutional duty to: (a) provide the affected officer with meaningful notice of the allegations underlying a prospective *Giglio* determination; (b) give the affected officer a meaningful opportunity to respond to the *Giglio* allegations before a prosecutorial decision is made; and/or, (c) otherwise ensure that any vicarious deprivation of an affected officer's right to continued employment is supported by meaningful due process.

### The Giglio Obligations and Practices of Maine Prosecutors

2.      Prosecutors have a constitutional duty to disclose potential impeachment information regarding prosecution witnesses, including officer-witnesses, to defense counsel. See *Giglio*, 405 U.S. at 154.

3.      When a prosecutor assesses whether information transmitted by an officer's employer falls within the scope of a *bona fide* allegation for *Giglio* purposes, it is important for the prosecutor to understand that "[a]llegations that cannot be substantiated, are not credible, or have resulted in the exoneration of an employee generally are not considered to be potential information." Policy No. 9-5.100 of the U.S. Department of Justice Regarding the Disclosure to

2

Prosecutors of Potential Impeachment Information Concerning Law Enforcement Agency Witnesses ("*Giglio* Policy").[1]

4.      Appellate judicial review has endorsed determinations by prosecutors or trial judges that false, non-factual, speculative, untrustworthy and/or unsubstantiated allegations were outside the scope of *Giglio* and *Brady* requirements.  See, for example, *United States v. Bulger*, 816 F.3d 137, 154-55 (1st Cir. 2016) (affirming the trial court's *ex parte* determination that allegations against an officer-witness were outside the scope of *Giglio* and *Brady* because an internal investigation revealed that the allegations were false and not factual, citing as examples *United States v. Souffront*, 338 F.3d 809, 823 (7th Cir. 2003) (finding that "[t]he failure to disclose untrustworthy and unsubstantiated allegations against a government witness is not a *Brady* violation"); *United States v. Ray*, 61 Fed. Appx. 37, 54 (4th Cir. 2003) (finding that the government's delayed disclosure of a statement did not violate *Brady* because the statement was "sheer speculation"); and, *United States v. Locascio*, 6 F.3d 924, 949 (2nd Cir. 1992) (affirming the district court's conclusion that no *Brady* violation occurred because, in part, the newly discovered government reports contained "untrustworthy" allegations).

5.      Maine prosecutors typically maintain a so-called *Giglio*-database or a manual filing system containing officer-related impeachment information for prospective disclosure to the Court (with an *ex parte* request for a *Giglio* determination) and/or to defense counsel.

6.      To avoid potential judicial sanctions, prosecutors typically fulfill their *Giglio* obligations with a broad brush and make disclosures to judges and defense counsel even when the purported *Giglio* allegations are only remotely meritorious.

---

[1] See https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings#9-5.100 (last visited on December 30, 2019).

7.     Prosecutors typically make *Giglio* determinations without any substantial regard to the potentially serious employment-related consequences to officers who are subjected to *Giglio* allegations that are not legitimate.

8.     Prosecutors typically perform little or no relevant investigation or analysis in an effort to resolve *Giglio* allegations against officers.

9.     Sometimes, prosecutors submit potential impeachment information to judges for *in camera* inspection and a judicial determination of whether a disclosure must be made to defense counsel.

10.    Sometimes, prosecutors request a judge to make an *ex parte* determination of whether disclosure to defense counsel is constitutionally necessary or submit a motion *in limine* requesting that the judge exclude the information from being used as impeachment information at trial.

11.    If a prosecutor makes a *Giglio* disclosure to defense counsel, an affected officer who is questioned about such allegations is typically given an opportunity to explain the context in which the allegations unfolded, thereby allowing the fact-finder to give the allegations and explanatory testimony whatever weight is deemed to be appropriate.

12.    In the most egregious cases, if a prosecutor makes a determination that there is an appearance of dishonesty or some other significant credibility issue with an officer-witness, the prosecutor summarily designates the affected officer as "*Giglio*-impaired" and refuses to prosecute any case in which the affected officer is a material witness.

13.    Typically, prosecutors make *Giglio*-impairment decisions without any meaningful notice to the affected officer.

4

14.     Typically, prosecutors make *Giglio*-impairment decisions without giving the affected officer any meaningful opportunity to dispute the *Giglio* allegations.

15.     A *Giglio*-impairment determination is a *discretionary* act by the prosecutor that is distinguishable from the constitutional obligation to disclose potential impeachment information to defense counsel and/or the court.

### The Constitutional Property Right to Continued Employment in the Absence of Meaningful Notice, Meaningful Opportunity to Respond to Job-Ending or Occupation-Ending Allegations and Due Process Before a Deprivation

16.     *Giglio*-related determinations by prosecutors may impact an affected officer's continued employability because officers must be able to provide testimony in legal proceedings, and prosecutorial findings of unreliability or untrustworthiness may render the officer unable to fulfill a job requirement.

17.     A prosecutor's *Giglio*-impairment decision nearly always leads to the affected officer's immediate job loss.

18.     A prosecutor's *Giglio*-impairment decision nearly always leads to a complaint against the affected officer's certification as a Maine law enforcement or corrections officer, without which the affected officer cannot engage in his/her occupation.

19.     A prosecutor's *Giglio*-determination may affect an officer's continued employment even if the affected officer is not deemed to be *Giglio*-impaired and the prosecutor only decides to make *Giglio* disclosures to the court and/or defense counsel.

20.     **Loss of a job.** A tenured officer affected by a prosecutor's *Giglio* determination has a state and federal constitutional property right to continued employment such that the affected officer is entitled to meaningful due process before the officer may be deprived of his/her employment.  See, e.g., *Mercier v. Town of Fairfield*, 628 A.2d 1053, 1054-56 (1993) (finding that "[a] property interest in continued employment may be established by contract, or

by proof of an objectively reasonable expectation of continued employment," citing *Hammond v. Temporary Compensation Review Bd.*, 473 A.2d 1267, 1271 (Me. 1984)).

21.     From a federal constitutional standpoint, the United States Supreme Court held in the context of a prospective termination of a tenured employee that "The essential requirements of due process … are notice and an opportunity to respond.  The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement. … The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).

22.     **Loss of an occupation**. Once the Maine Criminal Justice Academy ("MCJA") issues an occupational certification to an officer, the officer has a constitutional property right to engage in the occupation authorized by the certification.

23.     The Maine Supreme Judicial Court, referring to a licensee's property right in a professional license, decided that "[i]t is essential to a party's right to procedural due process that he be given notice of and an opportunity to be heard at any proceeding in which such property rights are at stake." *Senty v. Bd. of Osteopathic Exam. & Reg.*, 594 A.2d 1068, 1072 (Me. 1991) (citing *Fiorica*, 488 A.2d at 1375).

24.     In fact, Maine law recognizes an MCJA certificate-holder's right to procedural due process and those statutory due process rights include meaningful notice, a meaningful right to respond to allegations of misconduct, a right to an adjudicatory hearing and a right to judicial review of an adverse decision that imposes a sanction, including revocation, on an officer's certification.  See 5 M.R.S. § 8001, *et seq.*; 25 M.R.S. §§ 2805-C, 2806-A.

**The Lack of a Pre-Deprivation or Post-Deprivation Remedy to a Prosecutor's *Giglio*-Impairment Determination**

25.     After deciding that an officer is *Giglio*-impaired, Maine prosecutors notify the affected officer's employer that the prosecutors will henceforth refuse to accept any cases for prosecution in which the "*Giglio*-impaired" officer is a material witness.

26.     Prosecutors typically notify an affected officer's employer—without any corresponding notice whatsoever to the affected officer—about a prospective *Giglio*-impairment decision and without giving the affected officer any opportunities whatsoever to dispute the *Giglio* allegation(s) before the prosecutor makes a final *Giglio* determination.

27.     Notwithstanding to the right to due process before a deprivation of the property right to continued employment, an officer adversely affected by a prosecutor's *Giglio*-impairment decision has no statutory or judicially-recognized mechanism for appeal of a prosecutor's *Giglio*-impairment decision.

28.     Due to the natural consequences of confirmation bias, post-determination conferences with prosecutors by officers by a *Giglio* determination and/or their counsel are typically, if not always, fruitless—if a prosecutor agrees to discuss the *Giglio* determination.

29.     A *Giglio*-impairment decision inevitably leads to the affected officer's job loss because the officer is unable to testify in court, which is a prerequisite to continued employment for officers.

30.     In addition to a constitutional right to due process before a job loss, a tenured officer who is a party to a collective bargaining agreement and is threatened with a job loss invariably has a right to grieve the prospective job loss and to take an adverse grievance disposition to arbitration, which provides the affected officer with a significant measure of due process.

31.     A *Giglio*-impaired officer cannot obtain relief from a job loss by means of a grievance or arbitration proceedings under a collective bargaining agreement because the termination of employment is based upon a prosecutor's decision, which is beyond the control of the officer's employer.

32.     Even if a *Giglio*-impaired officer were to prevail in a grievance adjudication, a disciplinary hearing or an arbitration proceeding, the prosecutor's determination remains intact and the officer is unemployable.

33.     In addition to an immediate job loss, the chief executive of the officer's agency typically files a complaint against the officer's MCJA certification as a result of the findings contained in the prosecutor's *Giglio*-impairment decision.

34.     Like in the labor forum, the disposition of an MCJA certification complaint would revolve around the prosecutor's *Giglio*-impairment decision.

35.     Even if an officer were to avoid a revocation of his/her certification after administrative proceedings at the MCJA, he/she remains unemployable because the prosecutor's *Giglio*-impairment decision will continue in effect.

### Potential for Abuse

36.     To remain employed in their chosen occupations, law enforcement and corrections officers must fulfill special expectations of honesty, competence and fair treatment of individuals with whom they come in contact.

37.     In addition to managing risks to their personal safety and the wellbeing of those individuals that fall within the scope of their roles as community caretakers, officers are susceptible to civil suit, criminal investigation, criminal prosecution, intra-agency disciplinary

sanctions and/or certification sanctions in response to allegations of misfeasance, malfeasance and/or mistakes.

38.    Of course, adverse actions taken against officers may be justified, provided that alleged misconduct is proven pursuant to the applicable standard of proof and any sanction imposed is reasonable under the circumstances and consistent with the purposes of the particular forum.

39.    While the majority of law enforcement and corrections chief executives, as well as prosecutors, act in good faith and with diligence when making *Giglio* allegations, the failure of prosecutorial officials to provide affected officers with due process, including meaningful notice and a meaningful opportunity to dispute such allegations, creates a substantial potential for abuse or neglect.

40.    Whereas a non-probationary officer covered by a collective bargaining agreement has rights to grieve and arbitrate his/her termination, a *Giglio*-impairment determination by a prosecutor is essentially beyond the control of a terminated officer's chief executive. Consequently, a *Giglio*-impaired officer is barred from serving as an officer because of his/her inability to bring cases to court, making his/her termination a foregone conclusion.

41.    Similarly, a certification complaint made against an officer based upon his/her *Giglio*-impairment would likely be sustained because of the prosecutor's determination that the officer was not a credible witness.

42.    The prosecutor's *Giglio*-impairment determination would likely remain intact even if the MCJA Board dismissed the certification complaint to the MCJA Board without adjudicating the complaint's merits because the officer's rebuttal was persuasive at the screening stage or adjudicated the complaint's merits in favor of the officer after a hearing.

43.     Thus, the only way to protect an officer's right to due process before he/she is deprived of his/her property right to practice his/her occupation or profession as a result of a prosecutor's *Giglio* determination is by means of a judicial declaration that a prosecutor must provide meaningful notice of a potentially adverse *Giglio* determination and a meaningful opportunity to rebut the *Giglio* allegations.

## JURISDICTION & VENUE

44.     This Court has jurisdiction over the Complaint pursuant to 14 M.R.S. §§ 5951-5963 and Rule 57 of the Maine Rules of Civil Procedure.

45.     Venue is properly laid in the Penobscot County Superior Court pursuant to 14 M.R.S. § 505 because the principal office of the Penobscot County District Attorney (Prosecutorial District V) is situated at 97 Hammond Street in Bangor, Maine.

## PARTIES

46.     Richard ROE ("ROE") is a pseudonym for the plaintiff, a resident of Maine who holds certification as a Maine law enforcement officer issued by the Board of Trustees of the MCJA in Vassalboro.  ROE was a full-time, tenured police officer at a municipal police department (herein referred to as "XPD" for the purpose of maintaining the confidentiality of ROE's identity) located in Penobscot County until July 30, 2019, when the Town Manager terminated his employment for disciplinary purposes after Penobscot County District Attorney Marianne Lynch ("DA Lynch") issued a letter on July 23, 2019 advising she had determined that Officer ROE was *Giglio*-impaired in response to a *Giglio* allegation made by the Chief of Police ("Chief") at XPD.  ROE's Collective Bargaining Agent initiated various grievances regarding the Chief's treatment of ROE and arbitration proceedings are pending.  The Chief also filed a complaint against ROE's certification as a Maine law enforcement officer with the MCJA Board

of Trustees. In view of the pending arbitration and certification matters, ROE is entitled to confidentiality pursuant to 30-A M.R.S. § 2702(1)(B)(5) and 25 M.R.S. § 2806-A (10), respectively.

47.     Marianne Lynch is the Penobscot County District Attorney (Maine Prosecutorial District V) and issued the *Giglio*-impairment determination that caused the termination of ROE's employment and formed the core of the XPD Chief's MCJA certification complaint against ROE. She is a proper party to this action pursuant to 14 M.R.S. § 5963 because she has an interest that would be affected by the requested declaratory judgment.

## STANDING & JUSTICIABILITY

48.     ROE has standing to bring this action because he was the subject of DA Lynch's *Giglio*-impairment determination issued on July 23, 2019, which led to the termination of his XPD employment on July 30, 2019, and will continue to affect his employability as a law enforcement officer or preclude him from gaining other employment, and may lead to the revocation of his certification as a Maine law enforcement officer.

## FACTS

49.     The facts alleged herein reflect that DA Lynch deprived ROE of his constitutional employment-related property right to due process, including his right to meaningful notice of *Giglio* allegations made by the Chief and his right to a meaningful opportunity to respond to the allegations before DA Lynch made a *Giglio* determination that would foreseeably affect his property rights, specifically including the foreseeable termination of his employment at XPD as a law enforcement officer and the foreseeable likelihood, if not certainty, that he would be foreclosed forever from employment as a law enforcement officer or in a position of trust.

11

50.     The facts alleged herein reflect also how the Chief exploited the lack of due process in ROE's situation to facilitate a pattern of retaliation, harassment and workplace bullying.

## General Background of ROE

51.     ROE obtained a Bachelor of Science Degree in Criminal Justice and Administration in 2011 and an Associate Degree in General Studies in 2007.

52.     ROE completed more than 14 years of military service with the United States Marine Corps and the National Guard, including combat deployments in Iraq, and held various leadership positions while in military.

53.     ROE completed the Marine Corps Staff Noncommissioned Officers Academy in Hawaii in 1999.

54.     ROE completed a law enforcement training academy in another state in 2002 and the Maine Criminal Justice Academy Board of Trustees granted him a certificate as a Full Time Maine Law Enforcement Officer in 2010.

55.     By 2019, ROE had completed approximately 18 years of police service in Maine and other states, which included executive, detective and patrol officer positions.

56.     Seeking a higher level of job security, ROE applied for a vacant position as a patrol officer at XPD in July 2018.

57.     As part of the XPD hiring process, an XPD official interviewed a supervisor at ROE's then-current law enforcement agency ("YPD"), where he was employed as a detective.

58.     The YPD supervisor described ROE as an excellent officer and characterized ROE's quality of work as "very thorough," adding that his reports were "phenomenal."

59.    Regarding ROE's safety record, the YPD supervisor described him as "very safe," adding that there had been no issues with his safety record.

60.    In terms of initiative, the YPD supervisor reported that ROE was "very driven," adding that "when he sees something he goes after it."

61.    As for YPD's decision to hire ROE, the YPD supervisor reported that he had been very satisfied with the hiring decision and characterized ROE as an "excellent detective."

62.    The YPD supervisor reported that he "definitely" would rehire ROE and characterized him as "capable" and "competent."

63.    The YPD supervisor told the background investigator that ROE had not abused his sick leave, that he was very respectful to his supervisor, that he "uses the chain of command" and that he was dependable.

64.    The supervisor said that he had not received an external complaint about ROE.

65.    Regarding ROE's handling of YPD property, the supervisor reported that ROE "treats equipment like it's his own," adding that he respected YPD property "very well."

66.    The YPD supervisor told the XPD background investigator that he was aware that ROE's reason for seeking other employment was because he was trying to obtain better job security.

67.    In terms of strengths, the YPD supervisor said that ROE showed initiative and described ROE as a "hard worker" and a "great investigator."

68.    In the final analysis and based on his experience with ROE, the YPD supervisor told the XPD background investigator that he would "absolutely" recommend ROE for a position as a police officer.

69.     ROE successfully completed all other phases of the XPD pre-employment process, including a polygraph examination performed by a licensed Maine polygraph examiner.

70.     After due consideration, including a personal interview at the conclusion of the pre-employment process, the then-serving XPD Chief hired ROE as an XPD patrol officer.

71.     The XPD Chief who hired ROE retired in 2019.

72.     ROE and an XPD sergeant ("Officer A") applied for the vacant police chief's position at XPD, but instead the Town hired the currently-serving police chief, who was previously employed by another Maine law enforcement agency.

**Genesis of the Controversy**
**The Chief's Threat of Retaliation Against ROE**
**April 29, 2019**

73.     The new XPD Chief assumed the position of chief of police in early April 2019.

74.     The Chief demoted Officer A from sergeant to patrol officer after commencement of his duties as chief of police.

75.     On April 9, 2019, the Chief held a meeting with all XPD staff during which he prohibited staff members from gossiping about XPD business, admonishing the staff to keep XPD's "laundry (dirty or clean) in house," which he had also issued in the form of a verbal directive when taking the reins as police chief.

76.     On Monday, April 28, 2019, ROE, in his capacity as the XPD vehicle fleet inspector, took a police cruiser out of service after discovering that one of its tires required replacement.

77.     ROE notified the Chief via text message about the safety concerns that prompted him to remove the cruiser from service and the Chief advised ROE that he would take a look at the cruiser in the morning.

78.     On Tuesday, April 29, 2019, the Chief met with ROE in person and told ROE that he believed that ROE and Officer A, the other XPD officer who had applied for the chief's position, were conspiring against him because the Chief had demoted Officer A from his supervisory position.

79.     The Chief indicated to ROE that he believed that ROE and Officer A were going to sabotage the tire and then engineer a crash of the police vehicle that had been removed from service and then use the incident against the Chief.

80.     During the discussion, the Chief told ROE that he was putting him "on notice" and ROE, taken aback, asked the Chief for an explanation about the meaning of being placed "on notice."

81.     The Chief responded, "You know what that means" and ROE understood the Chief to be stating that he would retaliate against ROE.

82.     Thereafter, the Chief began a pattern of retaliation, harassment and workplace bullying against ROE.

### The Chief's Setting of the Groundwork for Retaliation Against ROE
### Contact with the DA's Office & Strategic Plan for Retaliation
### May 3, 2019

83.     By Friday, May 3, 2019, unbeknownst to ROE, the Chief reviewed a confidential report submitted to the former XPD chief of police by the polygraph examiner, which reflected that ROE had successfully completed the pre-employment polygraph process.

84.     On Friday, May 3, 2019, also unbeknownst to ROE, the Chief had a conference with Penobscot County Assistant District Attorney Christopher Almy during which he informed ADA Almy about information that he had gathered about ROE from ROE's pre-employment

polygraph report, which the Chief mischaracterized as misconduct notwithstanding ROE's successful completion of the polygraph process.

85.     Under Maine law, pre-employment polygraph examination results are confidential records and information pursuant to 32 M.R.S. § 7365(3) and 1 M.R.S. Chapter 13 and may not be disclosed without an express written waiver of confidentiality by the subject of the examination, which ROE did not provide.

86.     Section 7365 does not contain an exception allowing disclosure of confidential pre-employment polygraph examination results to prosecutors.

87.     After the Chief disclosed the confidential information from ROE's polygraph examination to him, Mr. Almy advised the Chief to submit a *Giglio* Compliance Form used by the Penobscot District Attorney's Office.

### The Chief's Contrived Admonishment to ROE About Imagined Rumor-Mongering
### May 6, 2019

88.     On May 6, 2019, the Chief ordered ROE not to "hang out" at the Town fire department station (where, as part of his duties, ROE would wash his police cruiser) and "to refrain from gossiping with [police officers from an adjacent municipality] on the town line or anywhere" so as "to prevent rumors from being started in reference to how the Police Department is being run."

### ROE's First Notice of Retaliation to the Human Resource Director
### May 7, 2019

89.     On May 7, 2019, ROE informed the Town's Human Resource Director that the Chief had threatened to retaliate against him on April 29, 2019 for having removed an unsafe police cruiser from service, accusing ROE and the second officer of sabotaging the police cruiser as a means of retaliating against the Chief because he had demoted the second officer.

90.     ROE also told the Human Resource Director that the Chief had admonished ROE about contributing to rumors about the Chief's management style.

91.     In addition, ROE told the Human Resource Director that the Chief had admonished him because he had discussed a parking issue with the Town's Code Enforcement Officer without getting permission from the Chief.

92.     In sum, ROE complained about the Chief's retaliatory conduct to the Human Resource Director.

93.     No Town official initiated a retaliation or disciplinary proceeding or investigation against the Chief as a result of ROE's complaints of retaliation to the Human Resource Director on May 7, 2019.

**The Chief's First Significant Acceleration of Retaliation
Interrogation of ROE
May 7, 2019**

94.     On May 7, 2019 and after ROE's discussion on that day with the Human Resource Manager, the Chief subjected ROE to an interrogation, primarily about two disclosures that ROE made confidentially during the XPD pre-employment polygraph examination process, each of which was related to his service with an out-of-state police department from 2005-2008.

95.     One of the confidential disclosures was related to an on-duty use of force in 2007, which was 12 years before the Chief's interview, which had resulted in ROE's total exoneration by law enforcement and prosecutorial authorities.

96.     The second confidential disclosure involved the out-of-state police agency's practice while ROE was employed there (during the period 2005 to 2008) that allowed officers to use unclaimed knives that were kept in a special storage area for official police business, which ROE had done and which had never resulted in any allegation of misconduct against ROE.

97.     During the Chief's interrogation of ROE on May 7, 2019, he told ROE that he would be making a *Giglio* complaint against ROE with the District Attorney and required ROE to complete a *Giglio* Declaration Form for submission to the District Attorney.

98.     ROE completed the *Giglio* Declaration on May 7, 2019 and denied any grounds for an adverse *Giglio* determination by the District Attorney.

99.     The Chief did not issue any sort of internal investigation notice to ROE or follow any commonly accepted internal investigation procedures when confronting ROE on May 7, 2019.

100.    The Chief's interrogation on May 7, 2019 happened only eight days after the Chief's unmistakable threat of retaliation on April 29, 2019; the Chief accused ROE of misconduct, including criminal conduct.

101.    ROE knew that the Chief's questioning related to actions that constituted neither misconduct nor criminal conduct, but he was concerned about the Chief's course of retaliation.

102.    ROE also knew that the facts raised by the current Chief were disclosed to the previous XPD chief of police during the pre-employment process and background investigation that ultimately led to the former chief's hiring of ROE as an XPD patrol officer.

103.    However, ROE feared that the Chief's interrogation of him on May 7, 2019 reflected that the Chief was carrying out the retaliation that was threatened on April 29, 2019 and ROE immediately conferred with his collective bargaining agent to seek a remedy.

### ROE's Second Notice of Retaliation to the Human Resources Director May 8, 2019

104.    On May 8, 2017, as a result of ROE's conference with his collective bargaining agent, ROE met with the Human Resource Director, described the interrogation conducted by the Chief, as well as other actions that the Chief had taken against him, and reported that the Chief's

18

conduct constituted retaliation against him just as the Chief had threatened to do on April 29, 2019.

105.    Later, the Chief advised ROE that ROE's collective bargaining agent was not part of XPD's chain of command and that ROE's contact with the Human Resources Director without permission from the Chief was a violation of the XPD policy that required him to follow the XPD chain of command.

106.    During the meeting on May 8, 2017, ROE told the Human Resource Director that the Chief had said that he had already discussed the Giglio issues with the Town's legal counsel and a representative of the District Attorney's Office before questioning ROE on May 7, 2019, without ROE's consent to disclosures of information or documents related to his pre-employment polygraph examination.

107.    During the meeting on May 8, 2017, ROE told the Human Resource Director that he believed that the Chief had violated confidentiality requirements regarding the handling of polygraph examination reports.

108.    During the meeting on May 8, 2017, ROE told the Human Resource Director that the Chief was exhibiting paranoid tendencies and that the Chief did not trust anyone, citing as examples instances in which the Chief questioned ROE about the subject matter of a discussion that ROE had with another XPD officer, a statement by the Chief that he had the "backing" of the Town's legal counsel to terminate any officer who engaged in rumor-mongering, and an order from the Chief that ROE was prohibited from talking to the Town Manager or any other Town official without first obtaining permission from the Chief.

109.    No Town official initiated a retaliation or disciplinary proceeding or investigation against the Chief as a result of ROE's complaints to the Human Resource Director on May 7, 2019.

## The Chief's Second Significant Acceleration of Retaliation
## May 8, 2019

110.    The Chief prepared a memorandum dated May 8, 2019, which was the same day that ROE had complained to the Human Resource Director a second time about the Chief's retaliatory course of conduct, with recommendations for adverse actions against ROE.

111.    In his memorandum of May 8, 2019, the Chief falsely alleged that ROE had failed to disclose the information described in the two confidential disclosures during the polygraph process in his XPD employment application and integrity questionnaire, whereas in fact neither document called for the disclosure of such information—and ROE made the disclosures during the polygraph process in response to questions from the examiner.

112.    In his memorandum of May 8, 2019, the Chief reported that he would be initiating a *Giglio* complaint against ROE at the Penobscot County District Attorney's Office and a complaint with the MCJA Board of Trustees against ROE's certification as a Maine law enforcement officer.

113.    In his memorandum of May 8, 2019, the Chief recommended that ROE be placed on *unpaid* administrative leave until the MCJA Board of Trustees issues a waiver for the disqualifying conduct that he had discovered and pending the performance of additional investigation, including whether ROE had lied on the employment application and integrity questionnaire.

**The Chief's Significant Third Acceleration of Retaliation**
**First *Giglio* Complaint to DA's Office**
**May 10, 2019**

114.    On May 10, 2019, the Chief sent an email communication with attachments,

including the *Giglio* forms that ROE and the Chief had completed on May 7, 2019, to ADA

Almy.

115.    On May 10, 2019, the Chief prepared a Law Enforcement Agency Review and

Disclosure form regarding ROE that called for the Chief's "identification of relevant discovery

and *Giglio* information" that reported under oath that there were "sustained findings of

misconduct," unresolved "credible allegations of misconduct" and "other circumstances that

raise serious concerns about [ROE's] credibility and/or reliability that should be disclosed to the

District Attorney's Office."

116.    In his electronic communication to ADA Almy of May 10, 2019, the Chief related

information from ROE's polygraph materials and claimed that ROE had committed theft when

using knives kept at a police station in 2009, which mischaracterized as theft ROE's disclosure

during the pre-employment polygraph process that an out-of-state law enforcement agency

where he served during the period 2005 to 2008 allowed officers to use unclaimed knives that

were kept in a special storage area for official police business, which ROE had done but which

had never resulted in any allegation of misconduct against ROE.

117.    In his electronic communication to ADA Almy of May 10, 2019, the Chief also

related that ROE had failed to disclose the alleged theft as well as a "critical incident,"—a

reference to a use of force while serving with the out-of-state law enforcement agency from 2005

to 2008 in which he was exonerated of any wrongdoing by all reviewing authorities—when

completing XPD's job application and pre-polygraph integrity questionnaire.

21

118.    In his electronic communication to ADA Almy of May 10, 2019, the Chief acknowledged that ROE had disclosed his official use of the unclaimed or abandoned knives during the pre-employment polygraph process, but did not disclose to ADA Almy that ROE had been cleared of any wrongdoing in the use of force incident.

119.    In his electronic communication to ADA Almy of May 10, 2019, the Chief offered to provide the polygraph results to ADA Almy in addition to the disclosures of information that he had already made to him.

120.    In his electronic communication to ADA Almy of May 10, 2019, the Chief wrote that "[a]t this time, [ROE's] character and integrity are in question and I lack the degree of trust that I should have for a police officer.  My internal investigation is ongoing and I will advise any further developments.  I do have the polygraph results and I can provide them to you if you would like to see them."

121.    On May 10, 2019, ADA Almy acknowledged the Chief's message of the same date and advised the Chief that he had concluded that "If [ROE] turns in cases and ends up being a witness we must disclose the *Giglio* issue to the defendant and the Court."

122.    ADA Almy made the *Giglio* determination of May 10, 2019, without giving notice to ROE, allowing ROE to respond to the allegations or conducting any independent investigation of the Chief's allegations.

**Town Manager's Denial of Opportunity to File a Retaliation Complaint Against the Chief May 15, 2019**

123.    On May 15, 2019, the Human Resources Director met with ROE and advised him that the Town Manager had determined that the Chief had the right to manage his staff, including by means of performance counseling and disciplinary actions.

124. During the May 15, 2019 meeting with ROE, the Human Resources Director advised ROE that the Town Manager refused to hear ROE's complaints of retaliation and said that ROE should pursue his concerns through his collective bargaining agent.

**Acceleration of Retaliation
Inchoate Disciplinary Action Set in Motion
May 15, 2019 – May 19, 2019**

125. On May 24, 2019, ROE made a request to the Chief for production of his entire personnel file pursuant to 26 M.R.S. § 631, defining the scope of the requested production in sync with the Maine Supreme Court's interpretation of Section 631 in the case of *Harding v. Wal-Mart Stores, Inc.*, 2001 ME 13, which required production of documentation related to allegations of misconduct.

126. By means of a transmittal dated May 31, 2019, which was not received by ROE's legal counsel until June 4, 2019, the Town's Human Resource Director produced what was purported to be ROE's complete personnel file to ROE's legal counsel.

127. ROE's personnel file contains a two-page document entitled "Written Reprimand #6-2019, OPEN" dated May 15, 2019 at the top of the first page and May 19, 2019 at the bottom of the second page, which also contains a handwritten notation on page 1 indicating that it was "info only" and "still open pending" on the second page on the Chief's signature line.

128. Written Reprimand #6-2019, contains various unresolved allegations of a civil or financial nature that, until ROE received the personnel file, had never been communicated to ROE in the form of a disciplinary proceeding and, as of his termination of employment at XPD, was never communicated to him as a disciplinary matter.

129. The personnel file of an applicant with previous law enforcement employment for a new law enforcement position would be within the scope of a pre-employment background

investigation and any adverse information contained in the file would have a bearing on the disposition of the officer's application for new employment.

130.    Written Reprimand #6-2019 has none of the earmarks of a disciplinary proceeding (because of a lack of notice, an opportunity to respond and a failure to issue a disposition after due process) and therefore is not a *bona fide* personnel action, so inclusion in ROE's personnel file would be incorrect in any situation and was unmistakably retaliatory in the context of ROE's circumstances.

**The Chief's Fourth Significant Acceleration of Retaliation**
**Issuance of Four Counseling Records & Five Reprimand Disciplinary Sanctions to ROE**
**Placement of ROE on Administrative Leave**
**May 17, 2019**

131.    On May 17, 2019, the Chief issued a total of nine personnel actions against ROE, including four counseling records and five reprimand disciplinary sanctions, based upon various non-meritorious, mitigated, exaggerated or contrived performance and conduct allegations.

132.    The four counseling records were non-disciplinary in nature and therefore the underlying factual allegations were not subject to investigation or appeal.

133.    The five reprimands were disciplinary in nature, but the Chief issued each of them summarily, without following a conventional internal affairs protocol that would have included a notice of alleged misconduct and an opportunity to respond to the allegations.

134.    One of the reprimands imposed discipline on ROE for having made a request to the Human Resource Manager for an opportunity to discuss his retaliation concerns with the Town Manager without first getting permission from the Chief, who was the subject of ROE's retaliation complaint.

135.    The Chief placed ROE on administrative leave, effective immediately, on May 17, 2019, without any written notice specifying the justification of the personnel action.

136.    At some point after May 17, 2019 and prior to May 20, 2019, the Chief informed

Officer A, who was ROE's union steward, that ROE should resign from his position as an XPD

officer or he would be fired.

137.    On May 22, 2019, ROE received a letter signed by the Chief that had been

"backdated" to May 17, 2019 and which stated in pertinent part that "[a]s of May 17, 2019 at

approximately 1800 hours, you are to be placed on paid administrative leave until such time as

an investigation could be concluded into possible *Giglio* and *Brady* violations.  May 7, 2019 [sic]

you were notified that an investigation into your application and possible *Giglio* violations would

be conducted.  In addition, several other complaints and violations of the Rules and Regulations

are being investigation."

138.    Town officials denied a request from ROE's collective bargaining agent for

disclosure of the details of the *Giglio* and *Brady* allegations mentioned in the notice of

administrative leave that the Chief provided to ROE on May 22, 2019.

139.    ROE's collective bargaining agent filed grievances with respect to the actions that

the Chief took against ROE, which the Chief ignored and the Town Manager denied.

140.    The grievances filed by ROE's collective bargaining agent are currently awaiting

resolution by arbitration.

**Denial of the Requests to the District Attorney's Office for Reconsideration of the
First *Giglio* Determination and an Opportunity for ROE to Respond to the Allegations**

141.    On approximately May 24, 2019, the Chief notified ROE and/or his collective

bargaining agent that ADA Almy would be making a decision on the Chief's *Giglio* complaint

on May 24, 2019, and that the Chief intended to terminate ROE's employment if there was an

adverse decision.

142.    After the Chief informed ROE that he would be filing a *Giglio* complaint against

him with the District Attorney's Office, ROE contacted ADA Almy and requested an

opportunity to respond to the complaint, but ADA Almy refused to speak to him and told ROE to

have his lawyer contact ADA Almy to discuss the matter.

143.    Pursuant to his discussion with ADA Almy, ROE retained legal counsel ("defense

counsel"), who engaged in a series of email message exchanges regarding the *Giglio* allegations

with ADA Almy on May 24, 2019.

144.    During the email message exchange with ADA Almy on May 24, 2019, defense

counsel informed ADA Almy that the Chief had not given ROE meaningful notice of the *Giglio*

allegations or a meaningful opportunity to respond to the allegations through the XPD internal

affairs process before presenting the *Giglio* complaint to ADA Almy.

145.    During the email message exchange with ADA Almy on May 24, 2019, defense

counsel informed ADA Almy that the Chief had notified ROE and/or his collective bargaining

agent that ADA Almy would be making a decision on the Chief's *Giglio* complaint on May 24,

2019, and that the Chief intended to terminate ROE's employment if there was an adverse

decision.

146.    During the email message exchange with ADA Almy on May 24, 2019, defense

counsel requested that ADA Almy defer a disposition of the Chief's *Giglio* complaint until ROE

was given notice of the specific allegations made by the Chief and ROE had an opportunity to

respond to the specific allegations made by the Chief.

147.    In his initial e-mail response to defense counsel on May 24, 2019, ADA Almy

wrote that defense counsel "need[ed] to address your concerns to … District Attorney Marianne

Lynch" and included DA Lynch on the distribution of his response to defense counsel.

148.   In an e-mail message reply to ADA Almy's instruction to defense counsel that was copied to DA Lynch, defense counsel acknowledged ADA Almy's direction and, in a paragraph directed to DA Lynch, requested that DA Lynch review the message traffic and defer any disposition on the Chief's *Giglio* complaint until after ROE had been given meaningful notice of the Chief's allegation and an opportunity to respond to the allegation.

149.   In a subsequent message in the e-mail thread on May 24, 2019, ADA Almy commented to defense counsel that he should "[r]emember that our obligation to disclose is to make the court aware of *Giglio* issues.  The court takes it from there."

150.   In a reply to ADA Almy's comments, defense counsel wrote on May 24, 2019 as follows:

> Thank you (sincerely) for your helpful comment.  I have a lot of experience with *Giglio* matters, as well as with the constitutional rights of due process that officers have in situations, like this one, where a police officer's employment may be terminated as a result of government action, which may happen here.  I know that you (when you were District Attorney) and that Marianne (in her current role as District Attorney) gave/will give careful consideration to the merits of a *Giglio* allegation before notifying the Court that an officer is *Giglio* impaired or that there are *Giglio* concerns that must be disclosed in a particular case.  As I understand the law on *Giglio* determinations, the prosecutor plays an important role in the process and a prosecutor [is] not a mere conduit for non-meritorious allegations.
>
> The first step, I think, is for a prosecutor to assess whether an officer did something that is contemplated by *Giglio* and its progeny, which is the issue here—an officer is entitled to notice and an opportunity to be heard before he loses his job.  Unfortunately, there is no established standard in Maine, it appears, for how prosecutors should review *Giglio* allegations and no standard process to ensure that an officer receives due process.  If, as happens here, a law enforcement agency chief executive fails to follow the internal affairs process, which would give an officer notice and an opportunity to be heard, the only option is to ask the prosecutor to provide such rights—and, if that fails, to file a civil action for declaratory judgment, or to ask a

27

Court to make a relevant ruling in some other proceeding.

Here, my request is that the District Attorney's Office pause the process until Officer [ROE] has an opportunity to get notice of the allegation and to respond to it before there is a decision that he has done something that is contemplated by *Giglio*, which may result in his job loss.

Thanks again, Chris. I look forward to hearing from Marianne (or from you, if you will be handling this matter).

151.    In response to defense counsel, ADA Almy simply wrote "Ok" in a return message sent on May 24, 2019.

152.    Neither ADA Almy nor DA Lynch made any response whatsoever to the substance of the communications from defense counsel, including the request by defense counsel for a deferral of the District Attorney's *Giglio* determination until after ROE was provided with meaningful notice of the *Giglio* allegations and a meaningful opportunity to respond to the allegations.

## Misconduct Complaint Against the Chief
## Initiated on May 28, 2019

153.    On May 28, 2019, ROE's collective bargaining agent submitted a misconduct complaint (which was inadvertently dated May 29, 2019, notwithstanding its submission on May 28, 2019) to the Town Manager.

154.    The collective bargaining agent's complaint alleged misconduct by the Chief, specifically retaliation and harassment against ROE.

155.    Although the two proceedings arose from similar facts, the misconduct complaint against the Chief was independent of grievances filed by the collective bargaining agent to vindicate ROE's job-related rights.

156.    From time-to-time, defense counsel submitted additional information to the Town Manager and/or legal counsel for the Town to supplement the misconduct complaint against the

Chief as additional events unfolded and/or to inquire about the status of the misconduct complaint filed against the Chief.

157.    As of the date of the filing of this Complaint, counsel for the Town has not provided any disposition of the misconduct complaint made against the Chief.

### DA Lynch's Decision on the Chief's First Giglio Complaint Against Roe May 30, 2019

158.    On May 30, 2019, DA Lynch transmitted a disposition of the Chief's *Giglio* complaint to the Chief.

159.    Neither DA Lynch nor the Chief nor any Town official transmitted a copy of DA Lynch's letter of May 30, 2019 to ROE or Defense Counsel.

160.    However, the Chief included a copy of the letter to the Board of Trustees for the Maine Criminal Justice Academy as part of a certification complaint dated July 29, 2019 that he filed against ROE.

161.    The MCJA Board issued a Notice of Complaint on August 7, 2019, which ROE received on August 9, 2019 and which included DA Lynch's letter of May 30, 2019.

162.    DA Lynch's letter of May 30, 2019 indicated that the Chief had submitted materials to her office in support of his *Giglio* complaint against ROE.

163.    DA Lynch's letter of May 30, 2019 indicated that details of ROE's polygraph examination, including ROE's admission that he had "[taken] knives that were the property of defendants out of the department's evidence locker" and his "admission that he was fired from [another police department due to allegations that he had misused a municipal credit card]", would be provided to the Court in cases in which ROE was a witness and the information may be used to impeach his testimony.

164.    As to the first allegation, if ROE had been given notice and a meaningful opportunity to respond, he would have demonstrated that he never took any knives that were the property of defendants from the police evidence locker.

165.    Rather, Roe would have demonstrated that the police chief of the out-of-state law enforcement agency where he worked from 2005-2008 authorized the official use of unclaimed or otherwise abandoned knives that were stored at the police station in a special drawer—and that those knives were not evidence or stored in an evidence locker.

166.    As to the second allegation, if ROE had been given notice and a meaningful opportunity to respond, he would have established that, in fact, he resigned from a previous police department after a town official had attempted to terminate his employment on a theory that he was still a probationary employee and that he had misused a municipal credit card.

167.    ROE would have established that the termination of his employment was rescinded after he filed a civil suit against the municipality for wrongful termination, which paid him a sum of money to settle ROE's claims, and that instead he resigned from that police department.

168.    ROE would have also established that he was not a probationary employee at the time of the attempted termination of his employment and that he had been authorized to make the challenged charges on the municipal credit card, meaning that the municipality had no cause for termination of his employment.

169.    In addition, ROE would have established that he disclosed during the pre-employment polygraph questionnaire for his position at XPD that he had resigned from a prior police department following a settlement of his claims against the municipality.

170.    Prior to his submission to DA Lynch, the Chief failed to follow a conventional internal affairs investigation and disciplinary protocol that would have necessarily included meaningful notice and a meaningful opportunity to respond to the allegations, which would have generated a complete complaint record as part of the *Giglio* proceedings.

171.    DA Lynch failed to give ROE meaningful notice of the Giglio allegations and a meaningful opportunity to respond to those allegations.

172.    Thus, ROE was therefore unable to rebut the allegations before DA Lynch issued her *Giglio* determination on May 30, 2019.

### The Chief's Letter of Exoneration
### May 30, 2019

173.    On May 30, 2019, the Chief issued a letter of exoneration to ROE advising that the investigation into the use-of-force incident and his purported non-disclosure of information on the XPD integrity questionnaire and employment application had been concluded.

174.    The Chief's letter of May 30, 2019 advised ROE that his "suspension" had been "lifted" and that he was "authorized to return to full duty."

175.    The letter's reference to a "suspension," which is a disciplinary measure with punitive consequences, contradicted the letter that the Chief issued to ROE on May 22, 2019 (backdated to May 17, 2019), which informed ROE that he was being "placed on administrative leave," which is a non-disciplinary, non-punitive personnel action.

176.    The letter issued to ROE on May 22, 2019 notified ROE that he would be in an administrative leave status "until such time as an investigation could be concluded into possible *Giglio* and *Brady* violations."

177.    Thus,  the letter of May 30, 2019 lifting ROE's "suspension" necessarily exonerated ROE of the *Giglio* and *Brady* allegations for XPD purposes.

31

178.   The letter of exoneration also admonished that "I [referring to the Chief] expect that in the future if there are questions about a policy or order, you would feel free to approach the Deputy Chief or myself."

179.   The reference in the letter of exoneration to "questions about a policy or order" and the Chief's expectation that ROE should discuss such issues with him or the Deputy Chief exposed the Chief's intent to initiate disciplinary measures against ROE for having made a personnel complaint against the Chief to the Human Resources Director.

180.   The exoneration letter was issued by the Chief on May 30, 2019, the same date as DA Lynch issued the disposition letter regarding the Chief's first *Giglio* complaint against ROE.

181.   Neither ROE's personnel file, nor any other evidence available to ROE, contains any indication that the Chief informed DA Lynch about ROE's exoneration.

### Request to the Chief for Withdrawal of the *Giglio* Complaint
### June 5, 2019

182.   Neither the Chief nor any Town official responded to requests made on ROE's behalf for the details of the Chief's *Giglio* allegations against ROE.

183.   On June 5, 2019, defense counsel wrote to the Chief, advising that he had completed a preliminary review of ROE's recently received personnel file, including documentation of the Chief's *Giglio* allegations against ROE.

184.   In the transmittal to the Chief dated June 5, 2019, defense counsel rebutted each of the Chief's *Giglio* allegations against ROE.

185.   With respect to ROE's use of force in 2007 when he was employed by a law enforcement agency in another state, defense counsel advised the Chief in his transmittal dated June 5, 2019 that ROE had been exonerated of any misconduct related to the use-of-force by the relevant District Attorney's Office, by the State Bureau of Investigation and ROE's law

32

enforcement agency, and that he had disclosed the information during the XPD pre-employment polygraph process.

186.    Regarding ROE's use of unclaimed or otherwise abandoned knives that were kept at the police station for official use when ROE was employed by an out-of-state law enforcement agency during the period 2005-2008, in his transmittal of June 5, 2019 defense counsel provided the Chief with the name and contact information of a police lieutenant in that agency who had confirmed to defense counsel that ROE's description of the official use of unclaimed or otherwise abandoned knives that were stored at the police station was consistent with the then-existing (and since-changed) practice authorized by the since-retired chief of police who served during ROE's tenure in 2005-2008.

187.    In his transmittal to the Chief dated June 5, 2019, defense counsel requested that the Chief exonerate ROE of the *Giglio* allegations, dismiss any remaining *Giglio*-related complaint against ROE and withdraw the *Giglio* complaint that he had made to the Penobscot District Attorney's Office because there were no grounds for an affirmative *Giglio* determination.

188.    The Chief did not respond to defense counsel's written submission dated June 5, 2019.

189.    Upon information and belief, the Chief did not take any investigative action to verify or rebut ROE's response, including any follow up on the information provided by defense counsel on ROE's behalf in reference to the Chief's *Giglio* allegations.

## Supplementation of the Misconduct Complaint Filed Against the Chief
## June 6, 2019

190.    On June 6, 2019, defense counsel reported additional allegations of the Chief's misconduct toward ROE via an email message to the Town Manager.

191.    In the June 6, 2019 communication with the Town Manager, defense counsel requested that: (a) the new information be incorporated with the earlier complaint made by the collective bargaining agent; (b) the Chief be directed to cease and desist from his harassment and retaliation against ROE; and, (c) the Town Manager arrange for a totally independent investigation of the Chief's conduct and that the Chief either be placed on administrative leave or removed from ROE's chain of command until there is a disposition of the pending grievances and the misconduct complaint against the Chief.

192.    In the June 6, 2019 transmittal to the Town Manager, defense counsel requested that the Town Manager notify him if the Town retains counsel in relation to the matters involving the Chief and ROE.

193.    Upon information and belief, the Town did not take any action on the misconduct complaint against the Chief.

### The Chief's Fifth Significant Acceleration of Retaliation
### Issuance of Two Additional Reprimand Disciplinary Sanctions to ROE
### June 11, 2019

194.    On June 11, 2019, the XPD Deputy Chief issued two additional disciplinary reprimands to ROE with textual content reflecting that the disciplinary measures were orchestrated by the Chief.

195.    The two reprimands that the Deputy Chief issued to ROE on June 11, 2019 were related to alleged actions by ROE that were contrived and/or exaggerated to give the appearance of a basis for discipline.

196.    One of the two reprimands that the Deputy Chief issued to ROE on June 11, 2019 included an allegation that ROE had made recent statements to Officer B indicating that the

Chief and Town Manager were under investigation for their treatment of ROE, which may lead to adverse consequences to them, and otherwise criticized the Chief.

197.    One of the two reprimands that the Deputy Chief issued to ROE on June 11, 2019 disciplined ROE for his alleged statements to Officer B, citing a department meeting held on April 6, 2019 in which the Chief "addressed the issue of gossiping & spreading rumors, and the airing of police laundry," adding that the Chief "ordered that such talk cease stating that it would not be tolerated."

198.    As with the underlying five reprimands initiated by the Chief, neither of the two reprimands that the Deputy Chief issued to ROE on June 11, 2019, which were all disciplinary measures, was the result of a conventional internal affairs proceeding that included meaningful notice of the allegation and a meaningful opportunity to respond to the allegation before a disciplinary decision was made.

199.    The Deputy Chief included a written statement signed by Officer B with one of the reprimands, which provided information about the statements that ROE allegedly made to Officer B about the Chief and/or the Town Manager.

200.    Upon information and belief, the Deputy Chief's portrayal (in the reprimand that she issued to ROE on June 11, 2019) of the information that Officer B possessed with respect to how ROE was being treated by the XPD command staff was disingenuous.

201.    Upon information and belief, the Chief asked Officer B to prepare the written statement that was incorporated with the Deputy Chief's written reprimand of ROE on June 11, 2019.

202.    Upon information and belief, the Chief told Officer B that his written statement would help the Chief "get rid of [ROE]."

203.   Upon information and belief, Officer B was "uncomfortable" with the Chief's request for the written statement.

204.   Upon information and belief, the Chief ordered Officer B to delete his written statement from the official XPD computer that Officer B had used to prepare the statement.

205.   Upon information and belief, Officer B concluded that the Chief's order to delete the written statement from the official XPD computer was "strange."

206.   It is a criminal offense in Maine for a person to intentionally destroy a public record or information.  17-A M.R.S. § 456.

207.   Upon information and belief, Officer A overheard the Chief say that he believed that Officer B and Officer C were "faking" medical conditions.

208.   Upon information and belief, Officer B characterized ROE as a "great addition" to XPD and someone with "a lot of experience in law enforcement."

209.   However, upon information and belief, Officer B observed the Chief and Deputy Chief of Police perpetrate "negative actions and unprofessional conduct towards Officer [ROE]" from April 2019 through July 23, 2019.

210.   Upon information and belief, Officer B concluded that the Chief and Deputy Chief "have treated [ROE] with utter disrespect and harassment."

211.   Upon information and belief, Officer B mentioned to the Chief and Deputy Chief at one point during the relevant time period that he had discovered that ROE had forgotten to sign out of his personal email account on an XPD computer and that Officer B had signed out of the email account for ROE.

212.    Upon information and belief, the Deputy Chief ordered Officer B not to sign out of ROE's email account if it happened again because the Deputy Chief and the Chief need to read his email messages.

213.    It is a criminal offense in Maine for a person to intercept communications by wire or a similar connection without the consent of either the person sending the communication or the intended recipient of the wire communication.  15 M.R.S. §§ 709, 710.

214.    Upon information and belief, the Chief told Officer B (after the Deputy Chief ordered Officer B to leave ROE's email account open in the future) that ROE "had dug a hole that he can't get out of."

215.    Upon information and belief, the Chief told Officer B that he believed that ROE had been recording conversations at the police station using hidden recording devices, which he ordered Officer B to locate.

216.    Upon information and belief, the Chief told Officer B that ROE had lied on his pre-employment polygraph examination, that ROE failed to disclose a use-of-force incident that occurred when he was employed by another agency and that ROE had been "charged with theft because he stole a knife from his last department."

217.    Upon information and belief, the Chief and Deputy Chief told Officer B that ROE "was being written up and [counseled] for not doing his job."

218.    Upon information and belief, the Chief told Officer B "that he looks for the day that [ROE] resigns or he would fire him ASAP," adding that "when [ROE] was suspended it was not long enough."

### Supplementation of the Misconduct Complaint Against the Chief
### June 12, 2019

219.   On June 12, 2019, defense counsel contacted the Town Manager again to report new harassment, retaliation and workplace bullying by the Chief against ROE and alleged that the new misconduct was part of a pattern, now including actions by the Deputy Chief that were orchestrated by the Chief.

220.   In the June 12, 2019 transmittal to the Town Manager, defense counsel reiterated his earlier request for a totally independent investigation of the misconduct allegations made against the Chief and that the Town place the Chief on administrative leave pending the disposition of the misconduct complaint against him.

221.   In the June 12, 2019 transmittal to the Town Manager, defense counsel advised the Town Manager that the Town had failed to acknowledge receipt of the misconduct complaint against the Chief made by ROE's collective bargaining agent and failed to follow conventional practice to investigate misconduct allegations against police personnel.

222.   In the June 12, 2019 transmittal to the Town Manager, defense counsel requested that the Town produce "the Town's and/or [XPD's] policy/policies regarding the acceptance, processing, investigation and resolution of misconduct complaints, as well as any similar policy/policies regarding workplace harassment, retaliation and/or bullying."

223.   The Town never produced the policy materials requested by defense counsel in the June 12, 2019 transmittal.

224.   In the June 12, 2019 transmittal to the Town Manager, defense counsel reiterated his request for a totally independent investigation into the allegations of misconduct that ROE's collective bargaining agent made against the Chief.

225.    The Town Manager did not respond to defense counsel's message of June 12, 2019.

226.    Upon information and belief, no action was taken on the misconduct complaint against the Chief.

**Communication with the Town Manager
Regarding the Misconduct Complaint Against the Chief
June 17, 2019**

227.    On June 17, 2019, defense counsel wrote via email to the Town Manager again and requested: (a) a confirmation that ROE had been exonerated of the *Giglio* allegations made by the Chief; (b) a confirmation that the misconduct complaint against the Chief was under investigation; and, (c) a status on defense counsel's requests that the Chief be removed from ROE's chain of command and/or placed on administrative leave pending the outcome of the investigation of the misconduct complaint against him.

228.    In the June 17, 2019 transmittal to the Town Manager, defense counsel advised the Town Manager that "the Town's failure to provide a response (or a meaningful response) to legitimate inquiries from an employee's lawyer and/or collective bargaining agent, especially in cases where there are allegations of harassment, retaliation and workplace bullying, raises questions of whether the Town is condoning the alleged misconduct—and may lead to liability for the Town."

229.    The Town Manager did not response to defense counsel's transmittal of June 17, 2019.

**Request to DA Lynch for Rescission of Adverse *Giglio* Determination
June 18, 2019**

230.    On June 18, 2019, defense counsel made a written submission to DA Lynch regarding the Chief's *Giglio* complaint against ROE.

39

231.    At the time of his submission to DA Lynch, neither defense counsel nor ROE was aware that DA Lynch had issued a *Giglio* determination on May 30, 2019.

232.    In the written submission to DA Lynch dated June 18, 2019, defense counsel requested that she rescind any adverse *Giglio* determination based upon the Chief's referral because there was no genuine issue that would support a finding that ROE was *Giglio*-impaired or that would raise any other *Giglio* considerations.

233.    In his submission to DA Lynch on June 18, 2019, defense counsel also requested that ROE's name be removed from any *Giglio* database kept by her office that would refer to the Chief's *Giglio* referral.

234.    In his submission to DA Lynch on June 18, 2019, defense counsel provided a legal basis for the proposition that an officer had a constitutional property right to continued employment, including the right to notice and an opportunity to respond to *Giglio* allegations before a determination is made.

235.    In his submission to DA Lynch on June 18, 2019, defense counsel advised her that the Chief and Town Manager had refused to provide the details of the Chief's *Giglio* referral to the District Attorney's Office.

236.    In his submission to DA Lynch on June 18, 2019, defense counsel advised her that due to the refusal by Town officials to provide details of the Chief's *Giglio* referral to ROE, he had made a demand for his personnel file pursuant to 26 M.R.S. § 631 the scope of which included a request for production of *Giglio* referral documentation.

237.    In his submission to DA Lynch on June 18, 2019, defense counsel advised her that the personnel file production had yielded documents that included the Chief's *Giglio* referral to her office.

238.    In his submission to DA Lynch on June 18, 2019, defense counsel advised her that he had submitted a rebuttal of the *Giglio* allegations to the Chief and requested that the Chief exonerate ROE of the *Giglio* allegations.

239.    In his submission to DA Lynch on June 18, 2019, defense counsel advised her that the Chief had not responded to either his letter or his request.

240.    In his submission to DA Lynch on June 18, 2019, defense counsel advised her that he had sent the Town Manager a similar request for ROE's exoneration of the *Giglio* allegations.

241.    In his submission to DA Lynch on June 18, 2019, defense counsel advised her that the Town Manager did not respond the request for exoneration.

242.    In his submission to DA Lynch on June 18, 2019, defense counsel advised her that he had requested the Town Manager provide him with the name of the Town's retained counsel.

243.    In his submission to DA Lynch on June 18, 2019, defense counsel advised her that the Town Manager did not respond to his requests for identification of the Town's counsel.

244.    In his submission to DA Lynch on June 18, 2019, defense counsel advised her that related labor issues were being raised in another forum.

245.    In his submission to DA Lynch on June 18, 2019, defense counsel advised her that the submission was being made to support a request that the Chief's *Giglio* referral be resolved in favor of ROE.

246.    In his submission to DA Lynch on June 18, 2019, defense counsel rebutted each of the Chief's *Giglio* allegations against ROE insofar as they were discernable from the

personnel file transmitted by the Town on June 4, 2019, which did not include DA Lynch's *Giglio* complaint disposition letter to the Chief dated May 30, 2019.

247.    In his submission to DA Lynch on June 18, 2019, with respect to ROE's use of force in 2007 when he was employed by a law enforcement agency in another state, defense counsel advised DA Lynch that ROE had been exonerated of any misconduct related to the use-of-force by the relevant District Attorney's Office, by the State Bureau of Investigation and ROE's law enforcement agency, and that he had disclosed the information during the XPD pre-employment polygraph process.

248.    In his submission to DA Lynch on June 18, 2019, regarding ROE's use of unclaimed or otherwise abandoned knives that were kept at the police station for official use when ROE was employed by an out-of-state law enforcement agency during the period 2005-2008, defense counsel informed DA Lynch that a police lieutenant currently employed by that agency confirmed ROE's description of the official use of unclaimed or otherwise abandoned knives that were stored at the police station was consistent with the then-existing (and since-changed) practice authorized by the since-retired chief of police who served during ROE's tenure in 2005-2008.

249.    In his submission to DA Lynch on June 18, 2019, defense counsel requested that she exonerate ROE of the *Giglio* allegations and remove ROE's name from any *Giglio* database because ROE had not engaged in misconduct as alleged by the Chief.

## Communication with Town Counsel
### Regarding the Misconduct Complaint Against the Chief
#### June 19, 2019

250.    On June 19, 2019, a lawyer retained by the Town ("Town counsel") notified defense counsel that he was representing the Town and that he would be reviewing the

misconduct complaints against the Chief, adding that "[y]our allegations are not such that the Police Chief will be placed on administrative leave or taken out of the chain of command with respect to Officer [ROE] at this point in time."

251.    On June 19, 2019, defense counsel responded to the message from the Town counsel and wrote that he was "surprised that the Town does not consider allegations of harassment, retaliation and workplace bullying under these circumstances to be a matter that would require the Chief to be removed from Officer [ROE's] chain of command ..., particularly considering the consequences if such allegations are proven in an appropriate forum and that the record shows a continuing pattern of abuse."

252.    In his email transmittal to Town counsel on June 19, 2019, defense counsel responded to the message from the Town counsel asking that the Town reconsider its position on the complaint alleging that the Chief targeted ROE for harassment, retaliation and workplace bullying.

253.    In his email transmittal to Town counsel on June 19, 2019, defense counsel reiterated his request for an independent investigation of the misconduct complaint filed against the Chief, opining that Town counsel was foreclosed from investigating the complaint because there would be a conflict of interest and at least the appearance of confirmation bias.

254.    In his email transmittal to Town counsel on June 19, 2019, defense counsel requested that the Town join in ROE's request that the Chief withdraw his *Giglio* complaint against ROE and/or the request that DA Lynch issue a determination no *Giglio* concerns exist.

255.    Upon information and belief, the Town did not act on any of the requests made to Town counsel on June 19, 2019 and no action was taken on the misconduct complaint against the Chief.

**DA Lynch's Denial of the Request for Rescission of the *Giglio* Determination
June 25, 2019**

256.    On June 25, 2019, DA Lynch issued a letter to defense counsel (which was

received on June 28, 2019) acknowledging receipt of defense counsel's letter (of June 18, 2019).

257.    DA Lynch's letter of June 25, 2019, summarily denied defense counsel's request

for ROE's exoneration and indicated that she did not accept any responsibility for resolving

ROE's rebuttal of the Chief's Giglio allegations, as follows (in pertinent part):

> As you are aware the State is under an obligation to report
> information that may be relevant to potential impeachment
> evidence under Brady/Giglio.  I take this responsibility very
> seriously and have concluded on cases where Officer [ROE] is
> involved our office will disclose this information to defendants.
>
> It is then up to the Court to determine if the information is relevant
> and admissible.
>
> Please note that I have not made a decision to refrain from
> prosecuting cases where Officer [ROE] is involved.

258.    DA Lynch's letter of June 25, 2019 indicates that a copy of her response to

defense counsel was distributed to the XPD Chief.

259.    DA Lynch did not provide defense counsel with a copy of the *Giglio* complaint

disposition letter that she issued to the Chief on May 30, 2019, meaning that ROE still had not

been given any meaningful notice of the specific *Giglio* allegations against him.

**The Chief's Sixth Significant Acceleration of Retaliation
Issuance of an Additional Reprimand Disciplinary Sanction to ROE
June 25, 2019**

260.    On June 25, 2019, the same day that DA Lynch issued her response to defense

counsel, the Chief issued a two-pronged written reprimand to ROE.

261.    The first prong was a duplicate of one of the reprimands that the Chief had

prompted the Deputy Chief to issue to ROE on June 11, 2019, and focused on a written

44

statement by Officer B and alleged that Officer B's statement reflected that ROE had created a hostile work environment.

262.   Upon information and belief, as reflected above, in fact the Chief and Deputy Chief had created a hostile work environment at XPD, which included their targeting of ROE for retaliation, workplace bullying and/or harassment.

263.   The second prong of the reprimand focused on the circumstances surrounding ROE's arrest of a male who had assaulted his domestic partner on June 16, 2019.

264.   ROE was the only officer available to respond to the scene of the assault.

265.   ROE attempted to photograph the victim's injuries with his personal camera, but the camera battery died as he pressed the camera button and he was unsure of whether a photograph was taken.

266.   Upon information and belief, the domestic violence victim was not happy when she realized that ROE had arrested her domestic partner because she depended on him for childcare.

267.   The Chief, who had been off duty, met ROE at the police station when he brought the arrestee there.

268.   The Chief asked ROE whether he had photographed the victim's injuries and ROE told the Chief that he was unsure because the camera battery died when he was attempting to snap the photograph.

269.   ROE retrieved the camera for his cruiser and determined that the camera would not function because of the dead battery.

270.   ROE told the Chief that the camera battery was dead and that he would recharge it, but believed that no photograph was captured by the camera during his attempt.

45

271.    The Chief had a policy that he did not transport prisoners and no other officer was available to transport the arrestee to the jail in Bangor, so it was ROE's responsibility to do so.

272.    ROE returned to the scene of the assault when transporting the arrestee to the jail and used another device to obtain a photograph of the victim's injuries.

273.    The victim was not happy that ROE had returned to the scene with her domestic partner as a prisoner in the police cruiser.

274.    ROE prepared a truthful probable cause affidavit and submitted it to the Court, and incorporated it into his police reporting activities.

275.    The second prong of the reprimand alleged that ROE had been untruthful when writing in the probable cause affidavit that he had attempted to photograph the injuries of a domestic violence victim on June 16, 2019, but the photography failed because the battery in his camera ran out of power as he was taking the photograph.

276.    The second prong of the reprimand also alleged that ROE had been untruthful when he told the Chief that he had photographed the victim's injuries on his first visit to the scene, but acknowledged that he had successfully photographed the victim's injuries with a second device on a return visit to the scene.

277.    In the second prong, the Chief acknowledged that ROE had retrieved the camera from his cruiser and was unable to produce a photograph because the camera battery had died.

278.    In the second prong, the Chief alleged that he had obtained a statement from the domestic violence victim reflecting that ROE had not photographed her injuries on his first visit to the scene.

279.    The second prong of the reprimand reflected that "a report will be forwarded to the District Attorney's office for review as a possible '*Giglio* Violation', and a corrected report submitted to preserve the integrity of that case and protect the rights of the victim."

280.    Prior to taking disciplinary action in the form of a reprimand, the Chief failed to follow a conventional internal affairs investigation and disciplinary protocol that would have necessarily included meaningful notice and a meaningful opportunity to respond to the allegations, as well as an investigation into the veracity of the complaint.

### The Chief's Second *Giglio* Complaint Against ROE
### June 27, 2019

281.    On June 27, 2019, the Chief submitted a second *Giglio* complaint against ROE to DA Lynch, advising her that "[t]his letter is to document behavior that has the potential to jeopardize the prosecution of cases generated from the jurisdiction under the [XPD]" and attaching the reprimand issued to ROE on June 25, 2019.

282.    Because the Chief alleged that ROE had been untruthful on June 16, 2019, it was foreseeable that DA Lynch would determine that ROE was *Giglio*-impaired unless ROE was able to rebut the allegations.

283.    It was foreseeable to DA Lynch that ROE would lose his job at XPD if she resolved the Chief's *Giglio* complaint against ROE with a determination that he was *Giglio*-impaired.

284.    It was foreseeable to DA Lynch that ROE could lose his MCJA certification as a Maine law enforcement officer and that he would be foreclosed from employment in Maine and other jurisdictions as a law enforcement officer if she resolved the Chief's *Giglio* complaint against ROE with a determination that he was *Giglio*-impaired.

285.    DA Lynch was on notice from the written submission by defense counsel to her dated June 18, 2019 that there were "labor issues" with the Chief and the Town in relation to the grounds for the Chief's first *Giglio* complaint against ROE.

286.    DA Lynch did not give ROE notice or an opportunity to respond to the *Giglio* allegations made by the Chief before she disposed of the Chief's complaint.

**Seventh Significant Acceleration of Retaliation**
**Issuance of an Additional Reprimand Disciplinary Sanction to ROE**
**July 4, 2019**

287.    On July 4, 2019, the XPD Deputy Chief issued a written reprimand, which is a disciplinary action, to ROE for allegedly failing to ensure that barricades had been set up for holiday parade and that the police cruisers had been washed.

288.    The content of the reprimand that the Deputy Chief issued to ROE on July 4, 2019 indicated that the Chief had prompted the disciplinary action against ROE.

289.    The content of the reprimand indicates that ROE provided reasonable explanations for the circumstances underlying the allegations contained in the reprimand, none of which would reasonably have led to discipline absent the retaliation, workplace bullying and harassment context against which ROE by the Chief and Deputy Chief.

290.    Prior to taking disciplinary action in the form of a reprimand, the Chief and the Deputy Chief failed to follow a conventional internal affairs investigation and disciplinary protocol that would have necessarily included meaningful notice and a meaningful opportunity to respond to the allegations.

**Communication with Town Counsel**
**Regarding the Misconduct Complaint Against the Chief**
**July 7, 2019**

291.    By July 7, 2019, Town counsel had failed to respond to the requests made by defense counsel in writing on June 19, 2019.

292.    On July 7, 2019, defense counsel wrote to Town counsel via another email message and requested that the Town respond to the requests made to the Town on June 19, 2019.

**Request to DA Lynch for Reconsideration of her First *Giglio* Determination**
**July 8, 2019**

293.    In a written submission dated July 8, 2019, defense counsel requested that DA Lynch reconsider her disposition of the Chief's first *Giglio* complaint against ROE.

294.    As stated above, neither DA Lynch nor the Chief disclosed the letter of May 30, 2019 that DA Lynch sent to the Chief and which contained her disposition of the Chief's first *Giglio* complaint against ROE.

295.    As stated above, DA Lynch's decision of May 30, 2019 described the Chief's *Giglio* allegations against ROE in a way that was unknown to ROE.

296.    As stated above, if ROE had known of the specific allegations that the Chief had made against him in the first *Giglio* complaint, he would have been able to rebut them before DA Lynch made her decision.

297.    The written submission to DA Lynch made by defense counsel on July 8, 2019 was based upon information known at that time to ROE and defense counsel about the specifics of the Chief's first *Giglio* complaint against ROE, which was based upon the Town's compulsory production of ROE's personnel file pursuant to a request under 26 M.R.S. § 631 that included a request for production of *Giglio*-related information.

49

298.     Among other information provided by his written submission to DA Lynch on July 8, 2019, defense counsel reiterated that the earlier submission to her dated June 18, 2019 had established that the Chief's *Giglio* complaint was not meritorious.

299.     Among other information provided by his written submission DA Lynch on July 8, 2019, defense counsel informed DA Lynch that the Chief had issued a letter to ROE on May 30, 2019, that exonerated him of the allegations then known to ROE and defense counsel.

300.     The written submission to DA Lynch made by defense counsel on July 8, 2019 contended that *Giglio* allegations against officers that cannot be substantiated, are not credible, or have result in an officer's exoneration should not generally be considered to be potential impeachment information with the meaning of *Giglio*, *Brady* and related cases.

301.     The written submission to DA Lynch made by defense counsel on July 8, 2019 contended that "privacy and liability concerns must be taken into account when a prosecutor's office incorporates information (and/or materials) in a '*Giglio* Information System' regarding allegations against officers that cannot be substantiated, are not credible, or have resulted in an officer's exoneration—because, except (perhaps) in truly extraordinary circumstances, such information (and/or materials) cannot be classified as *Giglio*-related since no credibility concerns have been established."

302.     The written submission to DA Lynch made by defense counsel on July 8, 2019 provided copies of exemplar *Giglio* policies adopted by various prosecutorial and law enforcement entities, as well as an appellate opinion in the case of *United States v. Bulger*, 816 F.3d 137 (1st Cir. 2016), all of which supported the propositions by defense counsel.

303.     DA Lynch did not respond to the written submission made by defense counsel on July 8, 2019.

304.    The Chief relied on DA Lynch's disposition of the first *Giglio* complaint against

ROE, among other materials and actions, as he continued to target ROE for retaliation,

workplace bullying and harassment.

### Additional Communication with Town Counsel
### Regarding the Misconduct Complaint Against the Chief
### July 16, 2019

305.    By July 16, 2019, Town counsel had not responded to defense counsel's

transmittals of June 19, 2019 and July 7, 2019.

306.    On July 16, 2019, defense counsel sent another email message to Town counsel

and requested a response to his earlier messages.

307.    On July 16, 2019, Town counsel advised defense counsel that "we have your

complaint and it is under consideration.  When we have finished our review we will respond."

308.    Upon information and belief, the Town did not take any action with respect to the

misconduct complaint against the Chief, including any action that would be consistent with

Town policy regarding the investigation and disposition of misconduct complaints against law

enforcement personnel.

### DA Lynch's *Ex Parte* Disposition of the Chief's Second *Giglio* Complaint Against ROE
### July 23, 2019

309.    On July 23, 2019, DA Lynch issued a letter to the Chief advising him that she had

determined based upon the Chief's submission that her office could "be unwilling to prosecute

cases in which Officer [ROE] has involvement in the future."

310.    At the time of her disposition of the Chief's second *Giglio* complaint, DA Lynch

was on notice that ROE had retained defense counsel for *Giglio* purposes.

311.   DA Lynch disposed of the Chief's second *Giglio* complaint against ROE without giving notice to ROE (and/or to his defense counsel) and without affording ROE an opportunity to respond to the allegations that the Chief made against ROE in the complaint.

312.   It was foreseeable to DA Lynch that her determination that ROE was *Giglio*-impaired would lead to his job loss at XPD.

313.   It was foreseeable to DA Lynch that her determination that ROE was *Giglio*-impaired could lead to the loss of his MCJA certification as a Maine law enforcement officer, meaning that he would unable to become employed in the law enforcement field.

314.   As reflected herein, ROE had substantial grounds for a rebuttal of the allegations that the Chief made in his second *Giglio* complaint against ROE.

### The Chief's Initiation of an MCJA Certification Complaint Against ROE July 29, 2019

315.   On July 29, 2019, the Chief submitted a complaint against ROE's certification as a Maine law enforcement officer with the MCJA Board of Trustees ("MCJA").

316.   As support for his complaint against ROE's certification, the Chief incorporated DA Lynch's *Giglio* determination of May 30, 2019, as well as her *Giglio*-impairment decision of July 23, 2019, in his submission to the MCJA.

317.   As support for his complaint against ROE's certification, the Chief alleged that ROE had failed to disclose on his XPD employment application that he was involved in a use-of-force incident that occurred in 2007 when he was employed by an out-of-state law enforcement agency, even though the Chief had exonerated ROE of those allegations in his notice to ROE on May 30, 2019.

318.   In fact, the XPD employment application did not call for disclosure of the use-of-force incident.

319.    In fact, the relevant out-of-state District Attorney exonerated ROE of any wrongdoing in the use-of-force cited in the Chief's certification complaint.

320.    In fact, the agency where ROE was employed at the time of the use-of-force cited in the Chief's certification complaint exonerated ROE of any wrongdoing.

321.    In fact, the State Bureau of Investigation with responsibility for investigating ROE's use-of-force exonerated ROE of any wrongdoing.

322.    The Chief was aware of ROE's exoneration of any wrongdoing in relation to the use-of-force cited in his MCJA certification complaint because it was a subject of defense counsel's written submission to him dated June 5, 2019.

323.    As support for his complaint against ROE's certification, the Chief alleged that ROE had stolen knives from suspects for his own personal use.

324.    In fact, as described above, ROE used unclaimed or otherwise abandoned knives that were kept at the police station for official use when ROE was employed by an out-of-state law enforcement agency during the period 2005-2008, in his transmittal of June 5, 2019 defense counsel provided the Chief with the name and contact information of a police lieutenant in that agency who had confirmed to defense counsel that ROE's description of the official use of unclaimed or otherwise abandoned knives that were stored at the police station was consistent with the then-existing (and since-changed) practice authorized by the since-retired chief of police who served during ROE's tenure in 2005-2008.

325.    As support for his complaint against ROE's certification, the Chief alleged that ROE had been fired from a previous law enforcement agency for misuse of a municipal credit card.

326.    In fact, as described above, ROE resigned from the law enforcement agency cited by the Chief in his MCJA certification complaint and the municipality settled a related civil suit with a monetary payment.

327.    In fact, as described above, ROE was authorized to use the municipal credit card for the purposes cited by the Chief in his MCJA certification complaint.

328.    It is evident that the Chief was aware of that ROE had resigned from the prior law enforcement agency cited in his MCJA certification complaint because materials submitted by the Chief in support of the complaint contradicted the Chief's representations and reflected his resignation.

329.    It is evident that the Chief was aware of the disposition of ROE's prior employment at the law enforcement agency cited in his MCJA certification complaint because materials contained in ROE's XPD personnel file contradicted the Chief's representations.

330.    The MCJA did not issue a Notice of Complaint to ROE until August 7, 2019, which he received on August 9, 2019, after the Town terminated ROE's employment on July 30, 2019.

331.    Fulfilling its obligation to provide due process to ROE, the MCJA's Notice to ROE included a copy of the Chief's submission to the MCJA, including the Chief's written allegations and all supporting documentation that the Chief enclosed with the MCJA certification complaint.

## Termination of ROE's XPD Employment
## July 30, 2019

332.    On July 30, 2019, the Town Manager terminated ROE's employment as an XPD officer as a result of DA Lynch's determination in response to the Chief's complaint that ROE was *Giglio*-impaired because the District Attorney's Office would not prosecute cases in which

he was involved and that he was therefore "not able to discharge this essential function of [his] job."

333.   The Town Manager gave ROE a copy of DA Lynch's *Giglio*-impairment decision at the meeting on July 30, 2019 during which his employment was terminated.

334.   Neither DA Lynch nor the Town Manager nor the Chief provided ROE with meaningful notice or a meaningful opportunity to respond to the allegations that DA Lynch relied upon when making her *Giglio*-impairment decision.

### Request to DA Lynch for Rescission of the *Giglio*-Impairment Decision & Reconsideration August 5, 2019

335.   In a written submission to DA Lynch dated August 5, 2019, defense counsel requested that she rescind her determination that ROE was *Giglio*-impaired and provide ROE an opportunity to respond to the Chief's *Giglio* allegations against him.

336.   In the written submission to DA Lynch of August 5, 2019, defense counsel asserted that his submission of June 18, 2019, had provided very substantial legal support for the proposition that an officer "had a due process right to notice and an opportunity to be heard before a prosecutor makes a *Giglio*-impairment or other *Giglio*-based decision because, as has actually happened in this case, an adverse decision could lead to a job loss, noting that an individual has a constitutional right to continued employment."

337.   In the written submission to DA Lynch of August 5, 2019, defense counsel wrote that "[w]ith all due respect, as you did previously, in this case you denied [ROE} notice about [the Chief's] *Giglio* allegation and an opportunity to be heard before making a decision that would certainly lead to his termination and the end of his employability as a law enforcement officer."

338.    In the written submission to DA Lynch of August 5, 2019, defense counsel advised her that ROE's collective bargaining agent had "initiated two separate arbitration cases alleging that [the Chief] had engaged in a pattern of harassment and discrimination, including by means of nine disciplinary actions after [ROE] attempted, at the direction of [his collective bargaining agent], to file a complaint against [the Chief] with the Town's Human Resources Director."

339.    In the written submission to DA Lynch of August 5, 2019, defense counsel advised DA Lynch that ROE's collective bargaining agent had filed a separate misconduct complaint with the Town Manager about the Chief's treatment of ROE, noting that the Town had not responded to the complaint.

340.    In the written submission to DA Lynch of August 5, 2019, defense counsel provided a *prima facie* rebuttal of the allegations contained in the Chief's second *Giglio* complaint against ROE.

341.    Notwithstanding the content of the submission, DA Lynch did not respond to defense counsel's submission of August 5, 2019.

### Request to DA Lynch for Reconsideration of the *Giglio*-Impairment Determination August 20, 2019

342.    In a written submission to DA Lynch dated August 20, 2019, defense counsel requested that she reconsider her determination that ROE was *Giglio*-impaired.

343.    In the written submission to DA Lynch dated August 20, 2019, defense counsel requested that she respond to his letters of July 8, 2019 and August 5, 2019.

344.    In the written submission to DA Lynch dated August 20, 2019, defense counsel advised that her determination that ROE was *Giglio*-impaired had foreseeably resulted in ROE's loss of his job as an XPD police officer.

345.     In the written submission to DA Lynch dated August 20, 2019, defense counsel advised that her determination that ROE was *Giglio*-impaired foreseeably caused him to be unemployable as a law enforcement officer or in any occupation requiring trustworthiness.

346.     In the written submission to DA Lynch dated August 20, 2019, defense counsel advised that her determination that ROE was *Giglio*-impaired may contributed to ROE's decertification as a Maine law enforcement officer because the Chief used her decision as a basis for his filing of an MCJA certification complaint against ROE.

347.     In the written submission to DA Lynch dated August 20, 2019, defense counsel asserted that ROE was entitled to due process.

348.     Notwithstanding the content of the submission, DA Lynch did not respond to defense counsel's written submission dated August 20, 2019.

## Dismissal of the Chief's MCJA Certification Complaint Against ROE
## January 10, 2020

349.     In a written submission dated September 18, 2019 made pursuant to the due process afforded to ROE by 25 M.R.S. § 2806-A(2), ROE, through defense counsel, responded to the Chief's certification complaint.

350.     On December 17, 2019, pursuant to the due process provisions of 25 M.R.S. § 2806-A(3), ROE and defense counsel participated in an Informal Conference initiated by the MCJA's Complaint Review Committee ("CRC") to discuss ROE's rebuttal to the Chief's certification complaint against him.

351.     On January 10, 2020, pursuant to the due process provisions of 25 M.R.S. § 2805-C, the CRC presented its review of the Chief's certification complaint against ROE, together with the CRC's recommendation as to its disposition, to the MCJA Board of Trustees.

352.   On January 10, 2020, the MCJA Board of Trustees voted to accept the CRC's recommendation as to the disposition of the Chief's complaint against ROE and voted to take no further action on the complaint because of insufficient evidence of disqualifying conduct, "effectively dismissing the pending [certification] case" against ROE.

## CLAIMS FOR RELIEF

### Count 1
### Declaratory Judgment
### (14 M.R.S. §§ 5953-5954)
### Declaration of Constitutional Rights

353.   ROE repeats and re-alleges each and every allegation set forth in Paragraphs 1 through 352, inclusive.

354.   A tenured officer affected by a prosecutor's *Giglio* determination has a state and federal constitutional property right to continued employment such that the affected officer is entitled to meaningful due process before he/she may be deprived of his/her employment.  See, e.g., *Mercier v. Town of Fairfield*, 628 A.2d 1053, 1054-56 (1993) (finding that "[a] property interest in continued employment may be established by contract, or by proof of an objectively reasonable expectation of continued employment," citing *Hammond v. Temporary Compensation Review Bd.*, 473 A.2d 1267, 1271 (Me. 1984)).

355.   Once the MCJA issues an occupational certification to an officer, the officer has a constitutional property right to engage in the occupation authorized by the certification.

356.   An MCJA certificate-holder has a corresponding constitutional right to notice and a meaningful opportunity to be heard before he/she may be deprived of that property right through revocation or similar actions.  *Balian v. Bd. of Registration in Med.*, 1999 ME 8, ¶ 11; *Bd. of Overseers of the Bar v. Lefebvre*, 1998 ME 24, ¶ 15, ¶ 15 n. 13 ("The due process

requirements of the Maine and Federal Constitutions are identical."); *Bd. of Registration in Med. v. Fiorica*, 488 A.2d 1371, 1375 (Me. 1985).

357.     "It is essential to a party's right to procedural due process that he be given notice of and an opportunity to be heard at any proceeding in which such property rights are at stake." *Senty v. Bd. of Osteopathic Exam. & Reg.*, 594 A.2d 1068, 1072 (Me. 1991) (citing *Fiorica*, 488 A.2d at 1375).

358.     An adverse *Giglio*-impairment decision or other *Giglio*-related determination by a prosecutor foreseeably affects an officer's property right to continued employment, which likely will result in the officers' job loss, as well as the loss of his/her certification, thereby foreclosing the officer from engaging in his/her occupation or profession, as well as create a history that would foreclose the officer from gaining employment in any occupation requiring trustworthiness.

359.     An adverse *Giglio*-impairment decision or other *Giglio*-related determination by a prosecutor that affects an officer's employment-related property rights is not subject to appeal or review by any official authority.

360.     Once a prosecutor his made an adverse *Giglio*-impairment decision or other *Giglio*-related determination, the only potential remedy is to ask the prosecutor for reconsideration, which may be ignored or, if a request for reconsideration is granted, subject to reinforcement due to confirmation bias.

361.     The employer of an officer who is the subject of an adverse *Giglio*-impairment decision or other *Giglio*-related determination by a prosecutor must accept the prosecutor's decision or determination at "face value."

362.   Accordingly, ROE is entitled to a judicial declaration that an officer who is a subject of *Giglio* allegations is entitled to due process, including meaningful notice of the allegations and a meaningful opportunity to dispute those allegations, before a prosecutor makes an adverse *Giglio*-impairment or other *Giglio*-related determination because such a decision would foreseeably lead to a deprivation of the affected officer's property rights to continued employment and/or to engage in his/her profession or occupation as an officer.

**Count 2**
***Mandamus* Relief**
**(14 M.R.S. § 5301)**
**Rescission of the *Giglio* Determinations Affecting ROE**

363.   ROE repeats and re-alleges each and every allegation set forth in Paragraphs 1 through 362, inclusive.

364.   Notwithstanding the decision by the MCJA Board of Trustees effectively dismissing the Chief's certification complaint against ROE, he is unemployable in the field of law enforcement and/or in any position requiring trustworthiness because the MCJA's decision had no effect on DA Lynch's decision to deem ROE as being *Giglio*-impaired.

365.   Accordingly, ROE is entitled to *mandamus* relief requiring DA Lynch to rescind the two *Giglio*-related determinations described above, including the *Giglio*-impairment decision that led to his job loss, because the determination process deprived ROE of his constitutional right to due process before DA Lynch took an action that would foreseeably and vicariously affect his constitutional right to continued employment, including a job loss, loss of a right to a certification to engage in an occupation or profession, and/or other impacts on his employability.

**Count 3**
*Mandamus* **Relief**
**(14 M.R.S. § 5301)**
**Due Process When Disposing of the *Giglio* Determinations Affecting ROE**

366.     ROE repeats and re-alleges each and every allegation set forth in Paragraphs 1 through 365, inclusive.

367.     Accordingly, in addition to the relief requested in Count 2, ROE is entitled to *mandamus* relief requiring DA Lynch to provide ROE with meaningful due process before making any further *Giglio*-related determinations regarding ROE, including meaningful notice of the allegations underlying the *Giglio* complaints specified herein, to provide ROE with a meaningful opportunity to respond to the allegations contained in those *Giglio* complaints, and to otherwise provide ROE with procedural and substantive due process when disposing of those *Giglio* complaints.

**PRAYER FOR RELIEF**

368.     WHEREFORE, respectfully requests that the Court grant the relief specified in Counts 1 through 3, and grant such other relief as the Court deems to be appropriate under the circumstances presented in relation to this Complaint.

Dated: January 21, 2020

Michael A. Cunniff, Bar Reg. No. 8883
McCloskey, Mina, Cunniff & Frawley, LLC
12 City Center
Portland, ME 04101
Telephone: (207) 772-6805
mcunniff@lawmmc.com